[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 30, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-10233
Non-Argument Calendar

_____

D. C. Docket No. 04-00023-CR-FTM-29-DNF

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EUGENIO GARZA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(March 30, 2006)**

Before BIRCH, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Eugenio Garza appeals his conviction and sentence for conspiracy to possess

500 grams or more of cocaine with intent to distribute, in violation of 21 U.S.C.

§§ 841(a)(1), (b)(1)(B)(ii), and 846. Although we find no clear error as to the district court's refusal to require disclosure of the identity of a confidential informant, as the government concedes, Garza is entitled to resentencing, because he was sentenced according to a mandatory guidelines scheme in contravention of the Sixth Amendment, and the record does not demonstrate that this Booker[1] error was harmless. We find, however, no clear error as to the district court's factual findings as to the drug quantity or the imposition of a leadership-role enhancement. Accordingly, we AFFIRM Garza's conviction and the court's factual findings in connection with sentencing but VACATE and REMAND for resentencing consistent with Booker.

## I. BACKGROUND

A federal grand jury indicted Garza on one count of conspiracy to possess 500 grams or more of cocaine, with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii), and 846. The indictment alleged that Garza conspired with "persons known and unknown to the Grand Jury." R1-1 at 1. Prior to trial, Garza filed a motion to compel additional discovery, arguing, inter alia, that the government had failed to make Brady[2] impeachment disclosures concerning the

---

[1] United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005)

[2] Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963).

2

specific criminal activities of Guadalupe Maldonado and Felix Gonzalez, individuals to whom Garza allegedly supplied cocaine. At a status hearing, Garza told the court that the government had disclosed to him that an unnamed individual reported that Maldonado had provided him with one or two kilograms of cocaine per week. Garza requested the identity of this individual for purposes of impeaching Maldonado. The government refused to disclose the name of the individual, who had later become a confidential informant, without the consent of the Department of Justice. The Department of Justice refused to provide its consent without the individual's permission. The court advised Garza that he could use a copy of the report with the name of the individual blacked out in cross-examining Maldonado and that, if Maldonado failed to admit the allegation, then "[they would] deal with it." R3 at 31.

At a motion hearing prior to trial, Garza again argued that he needed the name of the individual in order properly to cross-examine Maldonado and Gonzalez. The government advised the court that the individual still objected to his identity being released. Garza conceded that the information was relevant only as to possible impeachment and did not directly bear on the offense with which he was charged. The court denied Garza's motion to disclose the individual's identity

3

but stated that it would reconsider its ruling after it "s[aw] how the cross-examination [went] and what the witnesses sa[id]." R5 at 27.

At trial, Jason Lemery, a Florida Highway Patrol trooper, testified that, on 4 December 2002, he had observed a G&T Express tractor trailer without a front tag. R6 at 27. Trooper Lemery reported that the driver, Julio Sanchez, had claimed he was taking a load of limes to Miami. Id. at 30. After a K-9 unit had alerted to the tractor trailer, Trooper Lemery searched the cab and discovered 3,963 grams of cocaine and $4,000 in cash beneath a sleeper bunk. Id. at 32-34; R7 at 175. He then arrested Sanchez and his stepbrother, who had been a passenger in the cab of the truck.

Sanchez, who agreed to cooperate with the government as part of his plea agreement, testified that he had previously been employed as a truck driver by PMG Trucking, a company owned by Garza's father. R6 at 64-65, 70-71. Sanchez explained that Garza had been in charge of "taking the trips" for PMG. Id. at 71. He testified that, in 2002, Garza had asked him to transport cocaine to Florida from Texas. R7 at 5-6. On this occasion, Sanchez received approximately two kilograms of cocaine directly from Garza and, upon Garza's instructions, delivered the cocaine to Gonzalez. Id. at 6-7. Following this initial delivery, Sanchez transported cocaine for Garza between four and six more times. Id. at 8. Garza

4

paid Sanchez for transporting the cocaine after Sanchez returned from each delivery. Id. at 7-8.

Sanchez testified he obtained the cocaine directly from Garza in all but one instance. Id. at 8. In connection with the shipment for which he was arrested, Sanchez had instead obtained the four kilograms of cocaine from a trailer to which Garza had directed him. Id. Sanchez also explained that, prior to picking up the cocaine for Garza, he had picked up 100 pounds of marijuana for an individual named Frumencio Toledo and five kilograms of cocaine for an individual named Francisco Martinez. Id. at 9. He asserted that Garza had been unaware that he was delivering additional drugs for other individuals. Id. at 21. Sanchez testified that, prior to his arrest, he had delivered the marijuana to Jesus Garcia and five kilograms of cocaine to Francisco Martinez. Id. at 22. Sanchez further testified that he had transported, in total, approximately ten kilograms of cocaine for Garza and that he always delivered the cocaine to Gonzalez. Id. at 11.

Sanchez explained that, although he had stopped working for PMG Trucking in the middle of 2002, he had agreed to transport the four kilograms of cocaine for Garza in December 2002, because Garza wanted compensation for a load of produce that had gone bad in Sanchez's care. Id. at 13-15. Sanchez also reported that, with respect to this shipment, Gonzalez had said he would pay Sanchez

5

$1,000 for the delivery. Id. at 15. Sanchez conceded that he had initialed the portion of his plea agreement stating that he had picked up nine kilograms of cocaine from Garza in connection with the 4 December shipment and explained that he had actually picked up only four kilograms of cocaine from Garza on this occasion but that he had transported a total of nine kilograms. Id. at 16-17, 22. He also acknowledged that, during the time that he was working for G&T Express, a company run by Frumencio Toledo, he had transported a total amount of between six and seven kilograms of cocaine in three or four shipments for a drug business involving Toledo, brothers Miguel and Ernesto Garcia, and Jesus Garcia. Id. at 23, 44, 47-48. Sanchez explained that most of the drug deliveries he had made while working for G&T Express had been on behalf of Toledo and the Garcia group. Id. at 50. He testified that, in addition to the five kilograms he had delivered to Martinez on the day of his arrest, he had delivered two kilograms of cocaine to Martinez in October 2002. Id. at 51. Sanchez admitted that he had initially told a federal agent that he had never delivered cocaine for Garza prior to the delivery resulting in his arrest. Id. at 86.

Maldonado, who had agreed to cooperate with the state of Florida following his arrest on drug charges, testified that he and Gonzalez sold drugs out of

O'Reiley's, an auto accessories store that they owned together.[3]  R8 at 198, 203-04.

He stated that several individuals, including Garza, supplied them with cocaine.

Id. at 203.  Maldonado maintained that, prior to the attempted delivery that resulted

in Garza's arrest, Garza had supplied cocaine either to him or to Gonzalez on

approximately two occasions during the previous month and that they had obtained

a total of two or three kilograms of cocaine from Garza.  Id. at 205, 207.

Maldonado asserted that he did not know whether Garza had supplied drugs to

Gonzalez outside of his presence.  Id. at 208.  Maldonado stated that he had sold

cocaine before he met Garza, and that, after Garza was arrested, he continued to

sell.  Id. at 209, 219.  As to the cocaine seized on 4 December, Maldonado testified

that Garza had contacted Gonzalez and him and asked them to meet Sanchez and

hold the cocaine for him.  Id. at 215-16.  Maldonado maintained that Garza did not

tell them how much cocaine he was sending.  Id. at 216.

On cross-examination, Maldonado denied that he had occasionally received

as much as between two and five kilograms of cocaine at a time from another of

his suppliers, Manuel Martinez.  Id. at 224.  He also denied that he had been

supplying anyone with one or two kilograms of cocaine every couple of days.  Id.

---

[3]Before Maldonado testified, Garza argued once again that he needed the identity of the unnamed individual in order properly to cross-examine Maldonado.  The court responded that resolution of the issue would depend on what Maldonado said and did or did not remember.  R8 at 194.

7

at 226-27. Garza's attorney reserved a motion at this point in Maldonado's testimony. Id. at 227. Although Maldonado conceded that he had sold cocaine by the kilogram as well as by the ounce, when he was asked whether he sold kilograms of cocaine on a regular basis, he responded "[n]ot many but, yes, I was selling." Id. He later admitted that he had been involved with "many, many kilograms of cocaine" by the time of his arrest. Id. at 234-35. Although Maldonado conceded that a report of an interview that he had given to a federal agent stated that he had purchased drugs from Garza ten or fifteen times, he clarified that he was including purchases through Sanchez in this total as well. Id. at 252. Additionally, Maldonado admitted that, on 5 December 2002, Gonzalez told an informant that he could not sell him any drugs because narcotics agents had caught Sanchez with four kilograms of drugs the previous day. Id. at 259-60.

Gonzalez, who had also agreed to cooperate with the state of Florida following his arrest on drug charges, confirmed that he and Maldonado had begun selling drugs out of O'Reiley's in 2001. Id. at 264, 267. He asserted that he had obtained a total of seven or eight kilograms of cocaine from Garza, either directly from Garza or through Sanchez. Id. at 272-73. With respect to the 4 December seizure, Gonzalez testified that Garza contacted him and asked him to pick up cocaine from Sanchez and to hold it for him. Id. at 274-76. Gonzalez maintained

8

that he did not know how many kilograms of cocaine were in Sanchez's tractor trailer until after it had been intercepted by the highway patrol. Id. at 278. Gonzalez testified that he did not remember whether he had ever received cocaine from Garza when Maldonado was not present. Id. at 279. On cross-examination, Gonzalez conceded that, on the day after Sanchez's arrest, he had told an informant that he could not sell any cocaine to him because "four kilos [had been] taken [from] the trailer." Id. at 306-07.

At the close of all of the evidence, Garza moved to strike Maldonado's testimony based on the government's refusal to disclose the identity of the individual who had stated that Maldonado had supplied him with one or two kilograms of cocaine per week. The court denied Garza's motion to strike Maldonado's testimony finding "the balance weigh[ed] on the side of not disclosing the identity." Id. at 367. The court further found that this "did not, as it turned out . . . deny the defendant the right of effective cross-examination of Mr. Maldonado." Id. The jury found Garza guilty of Count One. The jury also specifically found that 500 grams or more of cocaine had been involved in his offense.

In preparation for sentencing, the probation office assessed a base and total offense level of 32, pursuant to U.S.S.G. § 2D1.1(c)(4) (2004), according to the

9

amount of drugs Garza had conspired to distribute, specifically, at least five kilograms of cocaine. With Garza's criminal history category of I, this resulted in a guideline range of 121 to 151 months imprisonment. Garza objected to the drug-quantity determination, arguing that Sanchez's statements were inconsistent and that Gonzalez and Maldonado's statements were false and the product of collusion. Garza also argued that, under Blakely,[4] his base offense level could not exceed that for 500 grams of cocaine, given the jury's verdict. The government objected to the PSI's failure to assess a two-level leadership-role enhancement, pursuant to U.S.S.G. § 3B1.1(c), arguing that the evidence at trial established that Garza was an organizer, leader, manager or supervisor of the conspiracy.

At sentencing, the district court overruled Garza's Blakely objections based on United States v. Reese, 382 F.3d 1308 (11th Cir. 2004), vacated, 543 U.S. 1114, 125 S. Ct. 1089, on remand, 397 F.3d 1337 (11th Cir. 2005). The court next overruled Garza's drug-quantity objection, stating that the record contained sufficient credible evidence to determine that the Garza had conspired to distribute five or more kilograms of cocaine. Finally, the district court sustained the government's role-enhancement objection:

> I do have some trouble with this, but in the end it seems to me the
> credible evidence convinces the Court that the defendant recruited or

---

[4]Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004).

10

at least solicited Mr. Sanchez for the transactions; that he gave him the coke or caused the cocaine to be given to him; that he told the defendant where to deliver the cocaine in Florida; and that he caused . . . Mr. Sanchez to be paid upon his return. . . . I think those factors satisfy section 3B1.1(c), and the Court will . . . adjust the role by two.

R10 at 52. This gave Garza a new guideline range of between 151 and 188 months imprisonment. The court, noting concern over the disproportionately greater sentence to which this range would subject Garza in comparison with his co-conspirators, who were prosecuted in state court, sentenced Garza to 151 months imprisonment – the bottom of the range. Id. at 56-58.

On appeal, Garza contends that (1) the government's failure to disclose the identity of an individual who had implicated Maldonado in a large-scale drug transaction prevented him from adequately cross-examining Maldonado, thereby violating his Sixth Amendment rights under the Confrontation Clause and that the district court erred in using a balancing test that weighed the disclosure of the informant's identity against Garza's needs because the government had not shown that the individual was a confidential informant in this case; (2) the district court illegally sentenced Garza pursuant to a mandatory guidelines scheme; and (3) incorrectly calculated his sentence in its (a) determination of the base offense level and (b) imposing a leadership-role enhancement.

11

## II. DISCUSSION

A. Identity of Informant

The Due Process Clause of the U.S. Constitution requires the government to produce all evidence, upon request, that is favorable to the accused and material to guilt or punishment. Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97. This disclosure obligation extends to impeachment evidence, because "[s]uch evidence is evidence favorable to an accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985) (quotation and citation omitted). "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility" generally constitutes suppression of material evidence justifying a new trial "irrespective of the good faith or bad faith of the prosecution." Giglio v. United States, 405 U.S. 150, 153-54, 92 S. Ct. 763, 766 (1972) (quotation and citation omitted).

Evidence is "material" for Brady purposes if there is a reasonable probability that a different result would have occurred had the evidence been disclosed. Bagley, 473 U.S. at 682, 105 S. Ct. at 3383. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. However, "[a] reasonable probability of a different result is possible only if the suppressed

12

information is itself admissible evidence or would have led to admissible evidence." Spaziano v. Singletary, 36 F.3d 1028, 1044 (11th Cir. 1994).

The Federal Rules of Evidence provide that extrinsic evidence may not be used to show specific instances of the conduct of a witness for the purpose of attacking the witness's credibility. Fed. R. Evid. 608(b). Any inquiry regarding specific acts may be made on cross-examination, however, if those acts are "probative of truthfulness or untruthfulness." Id. Acts probative of untruthfulness include forgery, perjury, and fraud, but not every unethical act. United States v. Novaton, 271 F.3d 968, 1006 (11th Cir. 2001). The district court "may in its discretion permit questioning about a witness' prior bad acts on cross-examination, if the acts bear on the witness' character for truthfulness. If the witness denies the conduct, such acts may not be proved by extrinsic evidence and the questioning party must take the witness' answer." United States v. Matthews, 168 F.3d 1234, 1244 (11th Cir.), opinion amended on other grounds on denial of rehearing by United States v. Moore, 181 F.3d 1205 (11th Cir. 1999) (per curiam).

In this case, the district court did not err in refusing to require the government to disclose the identity of an individual who had implicated Maldonado in a large-scale cocaine deal, because Garza failed to establish a reasonable probability of a different outcome had the individual's identity been

disclosed. Garza could not have called the individual to testify to contradict Maldonado's denial of the assertions regarding other drug activity, because such testimony would have constituted extrinsic evidence used solely to attack Maldonado's character for truthfulness and, thus, would have been excluded under Rule. 608(b). As to Garza's final argument, even if the district court had erred in using a balancing test to determine whether the unidentified individual was a confidential informant, the error was harmless given Garza's failure to show a reasonable probability of a different outcome had the individual's identity been disclosed.

B. Booker Error

Garza also asserts that his sentence was unconstitutional under Booker because he was sentenced (1) using facts, relating to both drug quantities and the leadership-role enhancement, that were neither admitted by him nor found by a jury beyond a reasonable doubt, and (2) pursuant to a mandatory guidelines scheme. We review a defendant's preserved Booker claim for harmless error. United States v. Mathenia, 409 F.3d 1289, 1291 (11th Cir. 2005).

After Garza was sentenced, we observed that the Supreme Court, in Booker, held that "the Sixth Amendment right to trial by jury is violated where *under a mandatory guidelines system* a sentence is increased because of an enhancement

14

based on facts found by the judge that were neither admitted by the defendant nor found by the jury." Mathenia, 409 F.3d at 1291(citing Booker, 543 U.S. at 233-44, 125 S. Ct. at 749-56). There are two types of Booker error. A Booker "constitutional error is the use of extra-verdict enhancements to reach a guidelines result that is binding on the sentencing judge." Id. A Booker "statutory error occurs when the district court sentences a defendant under a mandatory guidelines scheme, even in the absence of a Sixth Amendment enhancement violation." Id. (quotations and alteration omitted).

As the government concedes, the district court committed constitutional and statutory Booker error by enhancing Garza's sentence based on facts not found by the jury and then sentencing him under the mandatory scheme of the Federal Sentencing Guidelines. Thus, it remains only to determine whether that error was harmless.

A Booker constitutional error is harmless where the government can show beyond a reasonable doubt that the error did not contribute to the defendant's ultimate sentence. United States v. Paz, 405 F.3d 946, 948 (11th Cir. 2005) (per curiam).

> A non-constitutional error is harmless if, viewing the proceedings in their entirety, a court determines that the error did not affect the sentence, or had but very slight effect. If one can say with fair

> assurance that the sentence was not substantially swayed by the error, the sentence is due to be affirmed even though there was error.

Mathenia, 409 F.3d at 1292 (quotations and alterations omitted). "The non-constitutional harmless error standard is not easy for the government to meet. It is as difficult for the government to meet that standard as it is for a defendant to meet the third-prong prejudice standard for plain error review." Id. As the government also concedes, the record does not demonstrate that the Booker error in this case was harmless according to either of these standards. To the contrary, the district court's stated concern over the issue of disproportionality of punishment indicates that Garza's sentence might well have been shorter had the Guidelines been advisory. Accordingly, Garza is entitled to resentencing.

C. Factual Findings

For the purposes of resentencing, Garza also argues that the district court improperly calculated his Guidelines range by applying (1) a base offense level greater than that which would have resulted from the jury's verdict of "more than 500 grams of cocaine," and (2) a two-level leadership-role enhancement under U.S.S.G. § 3B1.1(c). The Sixth Amendment right to a jury trial does not prohibit a sentencing court from making factual determinations that go beyond a defendant's admissions. "As we have explained, 'all nine [justices] agreed that the use of extra-verdict enhancements in an advisory guidelines system is not

16

unconstitutional.'" United States v. Chau, 426 F.3d 1318, 1323-24 (11th Cir. 2005) (per curiam) (quoting United States v. Rodriguez, 398 F.3d 1291, 1301 (11th Cir.), cert. denied, __ U.S. __, 125 S. Ct. 2935 (2005).

### 1. Calculation of Base Offense Level

We review a sentencing court's application of the Sentencing Guidelines de novo. United States v. Edmonds, 348 F.3d 950, 952-53 (11th Cir. 2003) (per curiam). We review a district court's drug-quantity determination for clear error. United States v. Mertilus, 111 F.3d 870, 873 (11th Cir. 1997) (per curiam). "The government must establish the drug quantity by a preponderance of the evidence." Id. Where the district court "had the opportunity to observe . . . witnesses first hand at trial," we accord "great deference to the district court's assessment of the credibility and evidentiary content of their testimony." United States v. Lee, 68 F.3d 1267, 1276 (11th Cir. 1995). The Sentencing Guidelines provide that an individual who commits an offense involving more than 5 but less than 15 kilograms of cocaine receives a base offense level of 32. U.S.S.G. § 2D1.1(c)(4).

Here, the evidence clearly established that Sanchez had been transporting four kilograms of cocaine for Garza when he was arrested. Apart from this, the record offers extensive evidence of Garza's involvement with at least one additional kilogram. First, Sanchez testified that he had transported approximately

17

ten kilograms from Garza to Gonzalez over the course of his association with Garza. Second, Maldonado testified that Garza had supplied Gonzalez and himself with two or three kilograms in the month previous to Garza's arrest, apart from any he might have delivered to Gonzalez when Maldonado was not present. Gonzalez testified to receiving seven or eight kilograms either directly from Garza or through Sanchez, and he did not remember whether he had received any of that outside Maldonado's presence.

Although Garza contends that these witnesses' testimony regarding drug quantity should be disregarded because each witness testified to a different amount, the district court was in the best position to make credibility determinations in the face of any such inconsistencies and found the testimony credible to the extent that it consistently established that Garza had been involved with at least one additional kilogram of cocaine. Because the record demonstrates that Garza conspired to possess with intent to distribute at least five kilograms of cocaine, the district court did not clearly err in determining that Garza should be assigned a base offense level of 32, pursuant to U.S.S.G. § 2D1.1(c)(4).

2. Leadership-role Enhancement

Garza also argues that the evidence was insufficient to demonstrate that he controlled the actions of another participant such that the district court erred by

18

imposing a two-level leadership-role enhancement under U.S.S.G. § 3B1.1. We review a district court's decision to enhance a defendant's offense level based on a leadership role for clear error. United States v. Phillips, 287 F.3d 1053, 1055 (11th Cir. 2002). The Guidelines provide for a two-level increase "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). In distinguishing a leadership role, the district court should consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.4). "[T]he assertion of control or influence over only one individual is enough to support a § 3B1.1(c) enhancement." United States v. Jiminez, 224 F.3d 1243, 1251 (11th Cir. 2000). Responsibility for most of the preparation, planning, and details of a criminal operation is also sufficient to support such an enhancement. See Phillips, 287 F.3d at 1058.

Here, Sanchez testified that, while he was employed by PMG Trucking, Garza asked him to transport cocaine to Florida from Texas. In each case, he either obtained the cocaine directly from Garza, or Garza told him where to pick it up. Garza also paid Sanchez upon his return from each delivery, except with respect to the 4 December delivery, which was made at Garza's insistence to compensate for

19

the spoiling of a shipment of produce for which Sanchez had been responsible. Thus, the record demonstrates that Garza not only recruited Sanchez, but also asserted control or influence over him with respect to drug shipments to Gonzalez and Maldonado. Accordingly, we find the district court did not clearly err by assessing a leadership-role enhancement.

### III. CONCLUSION

Garza appeals his conviction and 151-month sentence for conspiracy to possess 500 grams or more of cocaine with intent to distribute. We find no clear error as to the district court's refusal to require disclosure of the identity of a confidential informant or as to the court's factual findings with respect to drug quantity and leadership-role enhancement. Nevertheless, sentencing Garza based on facts not found by a jury beyond a reasonable doubt pursuant to a mandatory guidelines scheme constituted constitutional and statutory Booker error that the record has not shown to be harmless under either applicable standard. Accordingly, we **AFFIRM** Garza's conviction and the court's factual findings in connection with sentencing but **VACATE** and **REMAND** for resentencing in light of Booker.