[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 29, 2000
THOMAS K. KAHN
CLERK

————————————

No. 98-5063
————————————

D.C. Docket No. No. 96-14015-CR-EBD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALBERTO RODRIGUEZ JIMINEZ,

Defendant-Appellant.

————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————

**(August 29, 2000)**

Before TJOFLAT, MARCUS and CUDAHY\*, Circuit Judges.

—————————
\*Honorable Richard D. Cudahy, U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

CUDAHY, Circuit Judge:

A federal jury convicted Alberto Jimenez of knowingly and intentionally conspiring to possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846. The district court sentenced Jimenez to 262 months in prison. Prior to the trial, Jimenez had moved to suppress, on various grounds, evidence obtained through a wiretap and by the search of his residence. These motions were denied. Jimenez appeals both the denial of these suppression motions and his sentence. We affirm

I.      Facts and Disposition Below

In early March of 1995, the United States Customs Service commenced an investigation, in conjunction with the Highlands County Sheriff's Office and other law enforcement agencies, of the importation of methamphetamine from Mexico. That investigation led them to suspect Alberto Jimenez, who during the time of the investigation was living with his girlfriend Mary Evelyn Sims. From May 11 to May 31, 1995, the agents and police maintained a valid wiretap on the telephone line at 902 West Prairie Street in Avon Park, Florida. Jimenez and Sims lived at that address, and the investigating officers intercepted about 1200 of their conversations.

On May 27, 1995, the police arrested Jimenez in his car in nearby Frost

Proof, Florida. When they searched his car, the police discovered six foil-wrapped bricks of marijuana, a handgun and ammunition. Jimenez was released on bond shortly after his arrest. The Sheriff's Office then applied for a search warrant, and the Highlands County Circuit Court authorized the search for evidence of marijuana and methamphetamine possession at the 902 West Prairie Street residence. When the agents and police executed the search warrant on May 29, 1995, both Jimenez and Sims were present, and Jimenez drew a gun from under a mattress. The police safely disarmed Jimenez and searched the house. As a result of that search, the agents seized a zippered "drug ledger" containing records of methamphetamine sales, $5,677 in cash, several firearms, $14,500 in uncashed payroll and travelers' checks and a small amount of marijuana.

A little less than a year later, a federal grand jury indicted Jimenez and seven others for knowingly and intentionally conspiring to possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846, for money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and § 1956(h), and for knowingly and intentionally using a telephone in facilitation of a felony in violation of 21 U.S.C. § 843(b). Jimenez filed a motion to suppress evidence discovered at his home on May 29, 1995, alleging that the search warrant affidavit was defective and did not demonstrate probable cause, a motion to suppress wiretap evidence and a motion to

suppress physical evidence alleging a violation of the "knock and announce" rule. After conducting hearings, the federal magistrate judge recommended that the three motions be denied. The district court adopted the magistrate judge's report and recommendations and denied Jimenez's pretrial motions.

At trial, the government introduced about 33 of the recorded telephone conversations into evidence. In two of the conversations, Sims made explicit references to Jimenez's physically abusing her. Other conversations contained coded references to marijuana and methamphetamine transactions, and both investigating officers and individuals who had conducted drug transactions with Jimenez and Sims explained the meanings of the various code words. One of these witnesses, Roger Fortner, testified extensively about drug transactions with Sims's son, Wayne Elder, and his own direct dealings with Jimenez and Sims. Lucy Hodge Parker testified that she bought methamphetamine from Sims and resold it for a profit, but only after Jimenez gave Sims the initial permission to sell. Joseph Parker testified that he was asked to follow Sims (as a guard) when she would deliver methamphetamine to customers, which she could only do after Jimenez gave her permission. The government introduced evidence of Jimenez's arrest for marijuana and firearm possession on May 27, 1995. It also introduced the physical evidence seized during the search of 902 West Prairie Street—including the "drug

4

ledger" that contained detailed information about methamphetamine transactions and was used to keep track of amounts owed by various buyers. The government explained that Jimenez had drawn a gun on the police when they entered to search the house.

The jury found Jimenez guilty of the methamphetamine conspiracy on March 2, 1998, and on July 22, the district court conducted a sentencing hearing. The probation officer determined that Jimenez distributed approximately 8.8 pounds of methamphetamine during the course of the conspiracy, and, in the Presentence Investigation Report, assigned a base offense level of 34 under the Sentencing Guidelines. The probation officer recommended a two-level increase under Guidelines § 2D1.1(b)(1) because firearms had been seized from Jimenez's car and house. The probation officer also recommended a four-level increase under § 3B1.1(a) for Jimenez's supervisory role in the extensive operation. At sentencing, Jimenez disputed his role in the enterprise, claiming that he was merely a partner of Sims and had no control over the resale activities of the people to whom they sold methamphetamine. The district court approved the firearm enhancement and found that Jimenez had performed some supervision, adjusting his offense level by two under § 3B1.1(c)—instead of four under § 3B1.1(a)—for his supervision of Sims. The district court thus assigned a total offense level of 38,

and it sentenced Jimenez to 262 months imprisonment.  Jimenez appeals.

II.    Discussion

On appeal, Jimenez raises three issues: (1) Did the district court err by denying his motion  to suppress the evidence seized during the search of the West Prairie Street residence on May 29, 1995?  (2) Did the district court abuse its discretion by not excluding evidence of Jimenez's uncharged marijuana and firearm possession and by not excluding evidence of his physical abuse of Sims? And (3) did the district court err by applying the two-level enhancement under § 3B1.1(c) of the Sentencing Guidelines.  We address, and reject, each of these claims in turn.

A.    The Search Warrant

We review the district court's denial of Jimenez's motion to suppress evidence under a mixed standard of review.  *See United States v. Gil*, 204 F.3d 1347, 1350 (11th Cir. 2000).  We review the district court's findings of fact under the clearly erroneous standard and the district court's application of law to those facts de novo.  *See id*.  Jimenez first argues that the application for the warrant was fatally deficient because it failed to establish the necessary nexus between him and the residence to be searched.  He apparently concedes that the application's

6

description of the place to be searched was sufficient to describe the house located at 902 West Prairie Street in Avon Park, Florida, but he vociferously argues that "there is a complete absence of *any* facts to support a finding that the residence where Simms and Jimenez live and supposedly conduct their drug business is in fact the house described in the Application." Br. at 25 (emphasis in original).

While it is true that a warrant affidavit must show that there is a fair probability that contraband or evidence of a crime will be found at the particular place to be searched, *see Illinois v. Gates*, 462 U.S. 213, 238 (1983), Jimenez overstates his case by claiming that there are no facts here establishing the necessary nexus. The affidavit usually refers to the place to be searched as "their residence"—referring to Jimenez and Sims—but it does not, as Jimenez points out, provide facts that show that Jimenez and Sims lived there. Although the affidavit never does demonstrate that Jimenez lives in that house, it didn't have to because there is one statement in the affidavit that clearly establishes the nexus between 902 West Prairie Street and evidence of a crime (regardless whether Jimenez actually lived there): "The information indicates that Jimenez has secreted large sums of currency in the residence and the currency is derived from the distribution of methamphetamine and cannabis." It is clear to us that "the residence" refers to the house described in the warrant application, which, as we have noted, Jimenez

7

has conceded is 902 West Prairie Street.  We find that the affidavit shows the required  nexus—that there was a fair probability that contraband or evidence of a crime would be found there—by demonstrating the link between Jimenez's illegal activity and the house.

Jimenez next argues that the affidavit in support of the application contains "only the Affiant's *conclusions* as to the evidence derived from the wiretap" and fails "to provide any underlying *facts*" from which a probable cause determination could have been made by the issuing judge.  Br. at 18 (emphasis in original).  The paragraph Jimenez complains about states, in full:

> During the past eighteen days your Affiant received information from a Title III Wire intercept.  The information obtained indicates that Evelyn Sims and Alberto Jimenez are involved in the transportation, distribution, and sales of Methamphetamine and Cannabis on a large scale.  The information indicates that Sims and Jimenez conduct the methamphetamine and cannabis transactions at their residence and also deliver the methamphetamine and cannabis to their customers on a continual basis.  The information indicates that Sims and Jimenez keep records, logs, and ledgers detailing the transactions along with debts owed them for methamphetamine and cannabis by their customers at their residence.  The information indicates that Jimenez has secreted large sums of currency in the residence and that the currency is derived from the distribution of methamphetamine and cannabis.  The information provided indicates that Sims and Jimenez have taken stolen property, specifically firearms as payment for methamphetamine and cannabis.  On 05-27-94 Your Affiant received information from the reliable source that Jimenez was en route to the Frostproof area to pick-up narcotics and return to Highlands County with them.  The information resulted in a Carrol search of Jimenez's vehicle when he returned to Highlands

county and the seizure of six pounds of Cannabis and the arrest of Jimenez, who has since bonded out of jail. During the Carrol Search of the vehicle a loaded 9mm semi-automatic pistol was located with the narcotics. Your Affiant noted that the six pounds of Cannabis were cut into one pound blocks and was comprised of tightly compressed "bricks" which appeared to have been part of a larger shipment.

R1:184 (attachment). Based on this paragraph, the task for the Highland County Circuit Court judge was "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. The circuit judge found that the affidavit established probable cause, and although we review that determination de novo, we must "take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

In his argument that the affidavit failed to establish probable cause, Jimenez analogizes the statements in the affidavit to the following: "I have information which indicates that the defendant is a drug dealer and has drugs in his house, and therefore there is probable cause to search." Br. at 23. He also likens it to the

affidavits found insufficient in *Aguilar v. Texas*, 378 U.S. 108, 109 (1964) ("[a]ffiants have received reliable information from a credible person and do believe that heroin" was being kept at a particular house), *overruled by Illinois v. Gates*, 462 U.S. 213 (1983). Thus, Jimenez concludes, the warrant affidavit is too conclusory and too unsubstantiated to permit the circuit judge to make an adequate probable cause determination.

The affidavit is not nearly as conclusory as Jimenez argues. A truly conclusory affidavit would have gone all the way and actually stated that probable cause exists, like the first supposedly analogous example Jimenez uses. This affidavit, at worst, summarizes the evidence gained through the wiretap. While it would perhaps have been preferable for the affidavit to have detailed some particular phone conversations, the affidavit states that those phone conversations "indicate that" various drug activities were taking place; this is an objective presentation of the information gained by the investigating officers. Nor does the affidavit fail to specify the source of the information, as in the *Aguilar* example: the affidavit clearly states that the wiretap was the source of the information, and this circuit has recently noted that "[t]he fact that a wiretap was the basis for gaining confidential information" lends reassurance as to the veracity of the information. *United States v. Glinton*, 154 F.3d 1245, 1255 (11th Cir. 1998). We

believe, therefore, that the affidavit was neither conclusory nor unsubstantiated and provided an adequate, though perhaps not extensive, basis for the circuit court's determination that probable cause existed.

Jimenez's final argument on this point is that the affidavit's reference to his arrest on "5-27-94" was "stale information" and could not provide probable cause. Although Jimenez was actually arrested on May 27, *1995*, the government concedes that we must analyze the arrest's contribution to probable cause as if Jimenez had been arrested, as misstated in the affidavit, a year earlier in May of 1994. We can dispense with this argument easily because, even assuming that it was stale, "such information is not fatal where the government's affidavit updates, substantiates, or corroborates the stale material." *United States v. Magluta*, 198 F.3d 1265, 1272 (11th Cir. 1999) (quotation omitted). *See also United States v. Green*, 40 F.3d 1167, 1172 (11th Cir. 1994); *United States v. Harris*, 20 F.3d 445, 450 (11th Cir, 1994). Here, the affidavit certainly updated and corroborated Jimenez's involvement with drugs based on information garnered from the seventeen days of wiretap evidence.

In sum, given the statement in the affidavit about Jimenez's past drug arrest, corroborated by the summary of the recent information obtained from the wiretap, there was a fair probability that Jimenez was involved with illegal activity and that

evidence of that activity would be found at the house described in the warrant. Accordingly, the search warrant was supported by probable cause, and the district court properly denied Jimenez's motions to suppress.[1]

## B. Admitted Evidence

We review the district court's ruling on admission of evidence for abuse of discretion. *See United States v. Maragh*, 174 F.3d 1202, 1204 (11th Cir. 1999). Jimenez first challenges the district court's admission of the evidence of Jimenez's involvement with marijuana and firearms. He argues that both should have been excluded under the Federal Rules of Evidence because they were irrelevant to his prosecution for offenses relating to methamphetamine, and he further postulates that the only purpose this evidence could serve was to make the jury think he had a propensity for dealing drugs. This evidence, he continues, citing to *Old Chief v. United States*, 117 S. Ct. 644, 650 (1997), was prejudicial because it invited the jury to generalize his earlier bad acts into bad character traits, improperly increasing the odds that he committed the methamphetamine crime charged.

The marijuana and firearm possession is evidence of uncharged criminal activities, which is generally considered inadmissible extrinsic evidence under

---

[1] Because we hold that probable cause existed to support the warrant, we do not address the "good faith" exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897 (1984). *See United States v. Foree*, 43 F.3d 1572, 1577 n.7 (11th Cir. 1995).

FED. R. EVID. 404(b).  However, such evidence is admissible if it is "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." *United States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998) (quoting *United States v. Ramsdale*, 61 F.3d 825, 829 (11th Cir. 1995).  Marijuana evidence is not necessarily irrelevant to proof of methamphetamine distribution.[2]  The marijuana evidence may not tend directly to prove Jimenez's distribution of methamphetamine, but it arose as part of the methamphetamine conspiracy, and it corroborates the government's evidence that referenced both methamphetamine and marijuana.  For example, the government introduced taped telephone conversations containing references to both "cupcakes with white icing" and "cupcakes with green icing," explaining that "white icing" referred to methamphetamine and "green icing" referred to marijuana.  Evidence that Jimenez was involved with marijuana supports the government's proposed meanings of these code words and, therefore, indirectly supports the government's claim that

_____

[2] We will not explore here whether, and to what extent, for purposes of admission of evidence under FED. R. EVID. 404, offenses involving one controlled substance are crimes "other" than the same offense involving another controlled substance. *Cf. Horton v. United States*, No. 99-3481, citation pending (7th Cir. 2000); *Edwards v. United States*, 105 F.3d 1179, 1180-81 (7th Cir. 1997) (holding types of drug that formed the object of a conspiracy is only a sentencing factor).  This possible issue has not been raised as such by the parties.

13

Jimenez was guilty of the charged methamphetamine offense. The fact that Jimenez drew a gun on the police when they searched his house does, as the government argues, lend support to the government's claim that he was involved in a drug conspiracy that required him to arm himself. Although this may not be the most obvious case for admissibility of this evidence, we cannot say that the admission of the marijuana or firearm evidence was an abuse of discretion.[3]

Jimenez also challenges the admission of evidence of his physical abuse of Sims. The district court admitted and the government played tapes of two conversations made on May 27, 1995. On these tapes, the jury heard Sims say, in an understandably agitated state, "He jumped on me again and beat me. . . . He hit me in my stomach, too! . . . He beat the hell out of me . . . with his fists." The government justified playing these portions of the tapes by claiming that they were "inextricably intertwined" with comments Sims made regarding Jimenez's ongoing participation in the drug conspiracy. In *United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999), we explained that "[s]ome types of extrinsic acts are particularly likely to incite a jury to an irrational decision . . . . [F]ew would doubt that violent spousal abuse falls into this category," *id.* at 1328 (quotation omitted), and we find

_____

[3] In any event, even if we were to assume that this evidence was improperly admitted by the district court, there was plenty of properly admitted evidence that supports Jimenez's conviction. We would therefore find the admission of the marijuana and firearm evidence harmless. *See United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999).

14

it hard to believe that the government could not have successfully redacted the abuse-related comments from these taped conversations. We need not, however, actually decide whether the abuse references were inextricably intertwined with other government evidence or were erroneously admitted because "[a]n erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless." *Id.* at 1329. Here, there was much properly-admitted evidence against Jimenez, and we are convinced that any possible error "'had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict.'" *Id.* (quoting *United States v. Fortenberry*, 971 F.2d 717, 722 (11th Cir. 1992)).

C.     Sentencing

Lastly, Jimenez argues that the district court improperly imposed a two-level enhancement for being a supervisor of the conspiracy under § 3B1.1(c) of the Sentencing Guidelines. Under that section, "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity, other than described in (a) or (b), increase [the defendant's offense level] by 2 levels." USSG § 3B1.1(c).[4] We will reverse the district court's determination of Jimenez's role in the offense

---

[4] Sections 3B1.1(a) and (b) both pertain to the organization or supervision of an enterprise with five or more participants. Section 3B1.1(c) has no such restriction on the number of participants supervised.

only if that determination was clearly erroneous. *See United States v. DeVaron*, 175 F.3d 930, 938 (11th Cir. 1999).

Although Jimenez correctly notes that being a drug supplier does not automatically make him a "supervisor" under the Guidelines, *see United States v. Yates*, 990 F.2d 1179, 1182 (11th Cir. 1993), the assertion of control or influence over only one individual is enough to support a § 3B1.1(c) enhancement. *See United States v. Glover*, 179 F.3d 1300, 1302 (11th Cir. 1999). Two witnesses testified that Sims had to consult with Jimenez before agreeing to sell drugs, and some of the taped conversations also indicated that Sims would consult with Jimenez (who could be heard in the background) when discussing drug transactions on the telephone. Given this evidence, we cannot say that it was clear error for the district court to conclude that Jimenez had asserted control or influence over Sims during the course of the conspiracy. Thus, Jimenez's argument fails.

III.    Conclusion

For the foregoing reasons, we reject Jimenez's claims on appeal and AFFIRM the judgment of the district court.