[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 24, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-14070
Non-Argument Calendar
_____

D. C. Docket No. 06-80038-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BANAN MAHMOUD QASIM,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 24, 2008)**

Before TJOFLAT, BLACK and HULL, Circuit Judges.

PER CURIAM:

After a six-day jury trial, Banan Mahmoud Qasim appeals his conviction on

Count III and sentences for conspiracy to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(B)(ii) and 846 (Count I), attempted possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(B)(ii) and 846 (Count II), and knowingly using or carrying a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count III).   After review, we affirm in part and dismiss in part.

## I. BACKGROUND

Because Qasim contends the evidence was insufficient to convict him on Count III, the firearm offense, we first outline the evidence presented at trial regarding the firearm in issue.[1]

### A.    Trial

Patrol officer Andrew Clark responded to a 911 call at the Pointe Apartments in West Palm Beach and found a dead body, later identified as Eric Rodriguez, inside a car.  Rodriguez had been shot in the head.  Desmond Cummings, a Pointe Apartments resident, witnessed the shooting.  Cummings saw two men run up to the car and one of the men crouched inside the driver-side window and fired a shot.  Another resident, Kelly Stokkers, saw two men pass her

---

[1]Qasim does not challenge the sufficiency of the evidence on Counts I and II.

in the apartment complex and walk toward the car. After she heard a shot, she saw the two men run away from the car and another man exit the passenger side of the car and flee. Stokkers then called 911.

At trial, it was undisputed that Rodriguez had driven to the apartment complex to meet defendant Qasim and that, earlier in the day, Qasim had contacted Rodriguez's friend, Pedro Cadaya, in Miami and arranged to introduce Cadaya and Rodriguez to someone who would potentially buy cocaine from them. In other words, Qasim was to be the middleman in the cocaine sale.

1.    Testimony of Tejeda

The government presented testimony from Javier Tejeda, another friend of Rodriguez who rode with Rodriguez and Cadaya from Miami to West Palm Beach on the day of the shooting. According to Tejeda, before traveling to meet Qasim in West Palm Beach, he, Cadaya and Rodriguez went to a Home Depot in Miami and purchased sheet rock. The men cut the sheet rock into squares, wrapped it in tape to look like two kilograms of cocaine and placed it in a shoe box. The men planned to "jack," or rob, Qasim and his potential buyer.

Rodriguez drove Tejeda and Cadaya in his car to West Palm Beach to meet defendant Qasim and the potential buyer. While in the car, Rodriguez showed Tejeda and Cadaya he had a gun. A few blocks before arriving at the apartment

3

complex, Rodriguez let Tejeda out to wait at a convenience store. Rodriguez and Cadaya then drove to the apartments to meet Qasim.

2.     Testimony of Merritt and Carr

The government also presented the testimony of Jerome Merritt and Ulysses Carr, two men involved in the ultimate shooting of Rodriguez in connection with the cocaine sale. Jerome Merritt testified that Qasim called him and asked if he knew anyone who wanted to make some money. Merritt recruited Adrian Chavers and Ulysses Carr to help Qasim purchase drugs that they then would sell. Merritt met Qasim, who was already present with Chavers and Carr. Qasim drove the four men in his car toward the Ale House. Before arriving, however, Qasim received a cell phone call, told the caller, "you know where to meet me" and drove to the Pointe Apartments.

Qasim pulled up behind another vehicle (which Rodriguez was driving) and told Chavers and Carr to walk up to the vehicle after Qasim reached it. As Qasim approached the vehicle, Chavers and Carr got out of Qasim's car. Merritt, who stayed in Qasim's car, was not paying attention until he heard some loud talking, at which point, he looked up and saw Chavers and Qasim on the driver's side and Carr at the rear of the other vehicle. Merritt heard a "loud pow" that sounded like a gunshot.

4

When Qasim, Chavers and Carr ran back toward Qasim's car, Merritt saw that Chavers was carrying something. When the three men entered the car, Merritt saw that Chavers was holding a gun and Carr was holding a shoe box. Qasim stated that "he shouldn't have trick[ed] me." Chavers stated that "[Rodriguez] shouldn't have grabbed the gun." Chavers opened the package inside the shoe box and noted that the substance was drywall, not drugs. From statements made in Qasim's car after the shooting, Merritt believed Chavers had fired the gun.

Carr testified he was approached by Chavers and asked to help in a robbery of drugs. Carr and Chavers met with Qasim and Merritt and all four got in Qasim's vehicle. There was no conversation about where they were going or what would happen. Based on Qasim's phone conversation in the car, Carr determined that the men were going to steal the drugs. After Qasim finished talking on the phone, he explained to Chavers and Carr that he wanted them to run up to the seller's car and take the drugs. Qasim indicated that he would approach the seller's car first and then give them a signal by walking to the trunk of his car like he was getting money.[2]

Carr watched as Qasim walked up to the seller's car and briefly spoke to the driver. Qasim walked to the back of his own car and opened the trunk. As Qasim

---

[2]Merritt, however, testified he did not know there was going to be a robbery and there was no talk of a robbery in Qasim's car beforehand.

5

was returning to the seller's car, Carr saw Chavers approach the driver's side window with Qasim and pull out a gun. Carr heard Chavers yell "give me the stuff, give me the stuff" and a few seconds later heard a "pow." As Qasim, Chavers and Carr ran, Chavers told Carr to grab a shoe box from the passenger side of the seller's car. Carr took the shoe box, and he and Chavers jumped into Qasim's car. As they drove away, Chavers had the gun in his lap. Qasim drove to Merritt's mother-in-law's house, where the men opened the shoe box and found drywall rather than drugs.

### 3. Chavers's Confession

Police detective Jose Antonio Matias, Jr., who investigated the shooting, testified that several witnesses told him Qasim was present at the shooting. Detective Matias also indicated that Chavers confessed to the shooting and told Mathias that Qasim had brought him to the apartment complex.

Following this testimony and after the jury was excused, the district court noted on the record that it was unusual for a government witness to testify about the progress of the government's investigation, including who investigators talked to and what they heard. The district court inquired whether it was a strategic decision to allow Detective Matias to testify about Chavers's confession. In response, Qasim's counsel admitted that he had "neglected to object" and moved to

6

strike Matias's testimony regarding Chavers's confession. The district court granted the motion. Qasim's counsel also moved for a mistrial. However, after the district court pointed out that Chavers's admission as the shooter was consistent with Qasim's defense, defense counsel withdrew the motion.

### 4. Qasim's Testimony

Qasim testified in his defense. According to Qasim, he had been working as a confidential information for the Drug Enforcement Agency ("DEA"). Qasim tried to arrange a controlled buy with Merritt, but Merritt failed to show. In an effort to develop a "solid target" for the DEA agents, Qasim began meeting on his own with Merritt and discussing possible drug deals.

On the day of the shooting, Qasim arranged to take Merritt to meet a drug middleman named Cadaya who could sell Merritt drugs. However, when Qasim arrived to meet Merritt, Chavers and Carr, whom Qasim did not know, were present, and Merritt insisted they come along. Qasim did not see any guns and did not know Chavers had a gun. During the drive, Qasim received cell phone calls from Cadaya indicating that Cadaya and Rodriguez had arrived and were waiting to meet. Qasim warned Merritt that Cadaya did not expect Chavers and Carr, and Merritt agreed to let the other two men out before the meeting. Qasim dropped Chavers and Carr off at a Publix parking lot approximately 45 feet from the Pointe

Apartments.

At the apartment complex, Qasim and Merritt approached the car. Chavers and Carr then appeared, and Chavers pointed a gun at Qasim. Qasim "freaked out" and returned to his own car with Merritt. Qasim heard a shot and tried to drive away. Merritt, in the passenger seat, pulled out a gun, pointed it at Qasim's head and told him to go back. Qasim complied and picked up Chavers and Carr, one of whom was carrying a box. Chavers had a gun and, after entering the car, told Qasim to "take off." Merritt directed Qasim to Merritt's mother-in-law's house, where they opened the box and learned that there were no drugs inside.

According to Qasim, he did not instruct Chavers and Carr to rob Rodriguez and did not know what was going to happen ahead of time. Qasim explained that he complied with Merritt's instructions only because he was afraid Merritt would hurt him. During cross-examination, Qasim admitted that he knew being involved with drugs was dangerous and that he had owned numerous guns to protect himself from drug dealers. The jury found Qasim guilty on all counts.

**B.    Sentencing**

Qasim's presentence investigation report ("PSI") grouped the drug charges in Counts I and II together, pursuant to U.S.S.G. § 3D1.2(d), and calculated a base offense level of 38 pursuant to U.S.S.G. §§ 2D1.1(d)(1) and 2A1.2, because a

victim was killed under circumstances that would constitute second degree murder. The PSI also recommended a four-level enhancement, pursuant to U.S.S.G. § 3B1.1(a), because Qasim was an organizer or leader of criminal activity involving five or more participants and a two-level enhancement because Qasim had obstructed justice. With a total offense level of 44 and a criminal history category of I, the PSI calculated an advisory guidelines range of life imprisonment for Counts I and II. The advisory guidelines range for the firearm charge in Count III was 120 months' imprisonment, to run consecutively to the sentence for Counts I and II.

Qasim objected on constitutional grounds to the calculation of his offense level based on the death of Rodriguez, arguing that he had not been charged with or convicted of second degree murder. Qasim also objected to the organizer/leader enhancement and the obstruction of justice enhancement.

Prior to the sentencing hearing, Qasim's counsel moved to withdraw because Qasim had alleged that his counsel was ineffective. The district court granted the motion without addressing whether counsel was ineffective and assigned Qasim new counsel.

At sentencing, the district court acknowledged that the guidelines were advisory and overruled Qasim's constitutional objections to the calculation of his

offense level based on Rodriguez's death. As to the managerial role enhancement, the district court found the trial testimony of Merritt and Carr credible and supported a two-level enhancement, given that less than five participants were involved. The district court found that the obstruction of justice enhancement was appropriate because Qasim had perjured himself at trial.

The district court calculated an advisory guidelines range of 360 months' to life imprisonment for Counts I and II. After considering the 18 U.S.C. § 3553(a) factors, the district court imposed a 360-month sentence on Counts I and II and a consecutive 120-month sentence on Count III, for a total sentence of 480 months' imprisonment. Qasim timely appealed.

## II. DISCUSSION

### A. Sufficiency of the Evidence as to Firearm Charge in Count III

To convict a defendant under 18 U.S.C. § 924(c), the government must show that, during and in relation to a drug-trafficking offense, the defendant used, carried or possessed a firearm in furtherance of that crime. United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004). A defendant may be liable for a co-conspirator's gun possession if the possession was reasonably foreseeable. United States v. Bell, 137 F.3d 1274, 1274-75 (11th Cir. 1998) (referring to this rule as "Pinkerton liability").

10

On appeal, Qasim argues that the government needed to prove he knew Chavers possessed a gun prior to the shooting to satisfy the intent element of a § 924(c) offense.[3] However, to establish Pinkerton liability under § 924(c), the government is not required to prove that the defendant had knowledge that his co-conspirator possessed a firearm. Rather, the government need only prove that his co-conspirator's use of the gun was reasonably foreseeable. United States v. Diaz, 248 F.3d 1065, 1099-1100 (11th Cir. 2001). Thus, the government was not required to prove that Qasim knew Chavers possessed a gun, and there is no error, much less plain error.[4]

## B. Constitutional Challenge to Sentence on Counts I and II

Under U.S.S.G. § 2D1.1(d), if a victim was killed during the commission of the drug trafficking offense under circumstances that would constitute second degree murder, the defendant's base offense level is 38 if level 38 is greater than

_____

[3]At trial, Qasim moved for a judgment of acquittal and argued that the testimony of Merritt and Carr was so inherently incredible that no reasonable jury could credit it. Qasim did not argue in the district court that this evidence, even if reasonably believed, was insufficient to satisfy the government's burden of proof. Thus, we review this issue raised for the first time on appeal for plain error. See United States v. Evans, 478 F.3d 1332, 1338 (11th Cir.), cert. denied, 128 S. Ct. 257 (2007).

[4]Additionally, although Qasim does not argue the point on appeal, we note that there was sufficient evidence from which a jury could conclude that Chavers's use of the gun during the drug theft was reasonably foreseeable to Qasim, even if Qasim did not know that Chavers had a gun. Moreover, the jury was free to discredit Qasim's trial testimony that he did not know about Chavers's gun and to conclude that the opposite was true. See United State v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) (explaining that a defendant's trial testimony, "if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt").

11

the offense level for the drug trafficking offense.  See U.S.S.G. § 2D1.1(d) (cross-referencing U.S.S.G. § 2A1.2 designating offense level for second degree murder).  Because Counts I and II involved 500 or more grams of cocaine, Qasim's offense level under the drug quantity table of § 2D1.1(c) would have been 26.  However, because Chavers killed Rodriguez during the drug offenses, the district court applied § 2D1.1(d) and concluded that Qasim's base offense level was 38.

On appeal, Qasim argues that, because he was not charged with murder, the district court violated his Fifth and Sixth Amendment rights by applying § 2D1.1(d) to calculate his base offense level.[5]  However, it is well-settled that "the use of extra-verdict enhancements in an advisory guidelines system is not unconstitutional."  Chau, 426 F.3d at 1323 (quotation marks omitted).  Thus, using the advisory guidelines, a sentencing court may enhance a sentence based on judge-found facts not charged in the indictment so long as the sentence does not exceed the statutory maximum sentence.  United States v. Dean, 487 F.3d 840, 854 (11th Cir. 2007), cert. denied, 128 S. Ct. 1444 (2008).

Here, there is no dispute that the district court applied the guidelines in an advisory manner.  Furthermore, Qasim's 360-month sentence on Counts I and II did not exceed the statutory maximum sentence of 40 years' imprisonment set by

---

[5]We review de novo the constitutionality of a sentence.  United States v. Chau, 426 F.3d 1318, 1321 (11th Cir. 2005).

21 U.S.C. § 841(b)(1)(B)(iii). Thus, the district court's setting of Qasim's base offense level at 38, pursuant to § 2D1.1(d), based on Rodriguez's death, did not violate Qasim's constitutional rights.[6]

## C.     Managerial Role Enhancement

Under U.S.S.G. 3B1.1(c), a defendant's offense level is increased by two levels when "the defendant was an organizer, leader, manager, or supervisor" of criminal activity that involved less than five participants and was not otherwise extensive. The defendant does not need to be the sole leader to be considered an organizer or leader. United States v. Ramirez, 426 F.3d 1344, 1355 (11th Cir. 2005). Furthermore, "the assertion of control or influence over only one individual is enough to support a 3B1.1(c) enhancement." United States v. Jiminez, 224 F.3d 1243, 1251 (11th Cir. 2000).[7]

The district court credited the trial testimony of Merritt and Carr, both of whom stated that Qasim told Chavers and Carr what to do when they arrived at the apartment complex. In addition, Merritt testified that he recruited Chavers and Carr at Qasim's request, that Qasim was responsible for communicating with the

---

[6]Whether the government would commence a second prosecution of Qasim for murder is speculation, and Qasim's double jeopardy claim is not ripe. See United States v. Tovar-Rico, 61 F.3d 1529, 1532 (11th Cir. 1995) (explaining that a double jeopardy issue is not ripe for decision until the government decides to proceed with another trial).

[7]A defendant's role under U.S.S.G. 3B1.1 is a factual finding we review for clear error. Ramirez, 426 F.3d at 1355.

13

other side of the drug deal and that Qasim was the only one who knew the location of the drug deal. Given the nature of Qasim's participation in the planning and commission of the offenses and the authority he exerted over others, we cannot say the district court clearly erred in imposing a two-level managerial role enhancement.

## D.     Ineffective Assistance of Counsel

Qasim also argues that his trial counsel was ineffective for failing to object timely to, or ask for a curative instruction regarding, Detective Matias's testimony about Chavers's homicide confession. Because the district court has not addressed this claim and we conclude the record is not sufficiently developed, we decline to address Qasim's ineffective assistance claim on direct appeal and we dismiss that claim without prejudice to Qasim's right to raise it in a 28 U.S.C. § 2255 motion to vacate. See Massaro v. United States, 538 U.S. 500, 504-05, 123 S. Ct. 1690, 1694 (2003).

**AFFIRMED IN PART, DISMISSED IN PART.**