[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 10, 2008
THOMAS K. KAHN
CLERK

_____

No. 08-10589
Non-Argument Calendar

_____

D. C. Docket No. 07-00179-CR-T-26TBM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAFAEL DEJESUS FRANCO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 10, 2008)

Before HULL, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

After a jury trial, Rafael Dejesus Franco appeals his convictions and 60-

month sentence for manufacturing and conspiring to manufacture over 100 marijuana plants, in violation of 21 U.S.C. §§ 841 and 846. After review, we affirm.

## I. BACKGROUND

### A. Trial

Because Franco challenges the sufficiency of the government's evidence, we outline the evidence presented at trial. Detective Joseph Gill, a narcotics unit detective, testified that he was walking in his neighborhood to obtain signatures for a petition to build a screen porch on his house when he noticed a car in the driveway of a house on Joshua Lane that he thought was vacant. As Gill approached, he smelled a strong odor of marijuana emanating from the house. Gill rang the doorbell, and Defendant Franco answered. Franco refused to sign Gill's petition because Franco said he did not own the house, but merely rented it.

Gill contacted Detective Jeremy Wharton, a Drug Enforcement Agency ("DEA") task force member, and, later that night, the two men and several other officers returned to the house. Detective Wharton testified that when he approached the house he smelled "an overwhelming smell of marijuana." Wharton knocked on the door, and Valentin Lopez answered. Lopez let the detectives in the house and directed them to a room containing marijuana plants. Approximately

2

250 marijuana plants were found in the house, along with large amounts of equipment necessary for a marijuana growth operation. According to Wharton, there was evidence that the marijuana was being harvested just before the detectives searched the house.

Because Lopez's English was poor, Detective Wharton called in Detective Alejandro Angulo, who acted as a translator. Detective Wharton showed Lopez a picture of Defendant Franco, and Lopez identified him as the owner of the house and showed detectives where Franco lived approximately a mile and a half away. Detectives Wharton and Angulo went to Franco's residence and spoke with Franco. Franco at first denied any knowledge of the Joshua Lane house. Once he was informed that Detective Gill had seen him there earlier, however, Franco admitted knowing about the house. Franco claimed that he went to the Joshua Lane house to receive steroid injections.

Lopez testified that he met Franco in a Miami nightclub and that Franco recruited him to take care of a house where marijuana plants would be grown, for which Lopez would receive a percentage of the profits. According to Lopez, Franco took Lopez to the Joshua Lane house, which Franco rented, instructed Lopez on what needed to be done to begin the marijuana growing operation and how to avoid drawing suspicion and gave Lopez a key to the house.

3

Lopez admitted signing a blank rental agreement Franco gave to him, but maintained that he did not rent the house or make rental payments. Instead, while Lopez lived at the Joshua Lane house, Franco paid the rent and visited regularly to supervise the marijuana growing operation. During this time, Franco, Lopez and several other men, brought in by Franco, converted the Joshua Lane house so that marijuana could be grown inside. Lopez then planted the marijuana according to Franco's instructions.

Franco also told Lopez when the marijuana plants were ready to be harvested. On the day of Lopez's arrest, he and Franco both had been harvesting the marijuana. Just before Detective Gill knocked at the door, Franco had decided to continue harvesting the next day. Lopez testified that Franco used steroids and that he would inject Franco with steroids that were kept at the Joshua Lane house.

Lopez also testified that, after he and Franco were arrested and released, Franco arrived at Lopez's home with a notary public and presented Lopez with a drafted sworn statement for Lopez's signature. The sworn statement indicated that Franco was not responsible for the marijuana plants found in the Joshua Lane house and that Franco visited the house solely to receive steroid injections. Lopez signed the statement, although it was false, because he was afraid and felt pressured.

In his defense, Franco testified that he showed Lopez the Joshua Lane house because Lopez was looking for a place to live and Franco knew that Jose Casmartino, the owner of the house, was looking for a tenant. According to Franco, he had Lopez sign Casmartino's lease and collected rent from Lopez to give to Casmartino. Franco explained that he went to the Joshua Lane house twice a week to receive steroid injections, but denied being involved in or aware of the marijuana growing operation. Franco also claimed that Lopez willingly agreed to sign the sworn statement that Franco was not involved in the marijuana growing operation.

Franco also presented testimony from Casmartino, the owner of the Joshua Lane house. Casmartino testified that, after being unable to rent the house, he asked Franco if he knew anyone who might want to rent it. Franco found someone to rent the house, although Casmartino never met Lopez. Franco collected the rent on the house.

Franco also called Luis Aguilar, the notary public who was present when Lopez signed the sworn statement. Aguilar testified that he drafted the statement based on information given to him by Franco. When Aguilar arrived at Lopez's residence to notarize the statement, Lopez did not appear to be afraid or under duress. Aguilar asked Lopez whether anyone had pressured him to sign the

statement, and Lopez told him that was not the case. Lopez then signed the statement without hesitation.

At trial, the district court denied Franco's motions for a judgment of acquittal. The jury found Franco guilty.

**B.    Sentencing**

The presentence investigation report ("PSI") recommended increasing Franco's base offense level of 18 by two levels because Franco had a managerial role and by another two levels for obstruction of justice. With a total offense level of 22 and a criminal history category of I, the PSI recommended an advisory guidelines range of 41 to 51 months' imprisonment.

Franco objected to, inter alia, both enhancements and argued that he was eligible for a safety valve reduction. During the sentencing hearing, the district court sustained Franco's objection to the obstruction-of-justice enhancement, but overruled his objection to the managerial role enhancement. In so doing, the district court stated, "Based on the trial testimony I heard, the upward adjustment is more than appropriate. Mr. Valentin Lopez was just a little caretaker here and this man was running the whole show for the people down in Miami . . . ." The district court's calculations resulted in an advisory guidelines range of 33 to 41 months' imprisonment. However, Franco was subject to a mandatory minimum sentence of

five years (60 months). The district court concluded that Franco was ineligible for

safety valve relief and imposed a 60-month sentence. Franco appealed.

## II. DISCUSSION

### A. Sufficiency of the Evidence

On appeal, Franco argues that the evidence presented at trial was insufficient

to convict him.[1]

To obtain a drug conviction under § 841(a)(1), the government had to prove

beyond a reasonable doubt that Franco knowingly and intentionally possessed with

intent to manufacture a controlled substance. See 12 U.S.C. § 841(a)(1). With

regard to the conspiracy charge, the government had to prove that (1) an illegal

agreement existed to possess with intent to distribute marijuana, (2) Franco knew

of the agreement and (3) Franco knowingly and voluntarily joined the agreement.

See United States v. Charles, 313 F.3d 1278, 1284 (11th Cir. 2002).

Here, the government presented evidence that detectives found

approximately 250 marijuana plants at the Joshua Lane house. Furthermore, Lopez

testified that Franco: (1) rented the Joshua Lane house, (2) recruited Lopez to grow

the marijuana at the house and offered him a percentage of the proceeds as

---

[1]We "review challenges to the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government." United States v. Futrell, 209 F.3d 1286, 1288 (11th Cir. 2000).

compensation, (3) brought additional men into the house to help convert it into a "grow house," (4) taught Lopez how to grow marijuana inside the house, (5) supervised Lopez as he cared for the plants, and (6) told Lopez when it was time to harvest the marijuana and helped Lopez in the harvesting. In addition, Detective Gill identified Franco as being at the house several hours before the plants were found.

Thus, there was ample evidence from which a jury could conclude beyond a reasonable doubt that Franco was guilty of possessing marijuana plants with the intent to manufacture marijuana and that Franco entered into a conspiracy to possess marijuana with the intent to distribute it. Franco's argument that Lopez's testimony is not credible is unavailing. The jury's verdict shows that it found Lopez's testimony to be credible, and we have no occasion to disturb this finding. See United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999) (explaining that the power to determine the credibility of witnesses is the "exclusive province" of the jury and "the court of appeals may not revisit this question"). In addition, the jury was free to (and obviously did) disbelieve Franco's testimony that he did not rent the Joshua Lane house and did not know there were marijuana plants in the house and could conclude that the opposite was true. See United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) (explaining that a defendant's trial testimony, "if

disbelieved by the jury, may be considered as <u>substantive evidence</u> of the defendant's guilt").

**B.    Managerial Role Enhancement & Safety Valve Relief**

Franco also challenges the district court's application of the managerial role enhancement, which rendered him ineligible for safety-valve relief.[2]

Under U.S.S.G. § 3B1.1(c), a defendant's base offense level is increased by two levels if the sentencing court finds that the defendant "was an organizer, leader, manager, or supervisor" in criminal activity that involved less than five participants or was not otherwise extensive.  <u>See</u> U.S.S.G. § 3B1.1(c). Furthermore, "the assertion of control or influence over only one individual is enough to support a § 3B1.1(c) enhancement."  <u>United States v. Jiminez</u>, 224 F.3d 1243, 1251 (11th Cir. 2000).  If the sentencing court finds that the defendant was an organizer or manager of the offense, then the defendant is ineligible for safety-valve relief from the statutory minimum sentence.  <u>See</u> 18 U.S.C. § 3553(f)(4); U.S.S.G. § 5C1.2(a)(4).

As already discussed, Lopez testified at trial that Franco recruited him to

---

[2]A defendant's role under U.S.S.G. § 3B1.1 is a factual finding we review for clear error. <u>United States v. Ramirez</u>, 426 F.3d 1344, 1355 (11th Cir. 2005). "When reviewing a district court's safety-valve decision, we review for clear error a district court's factual determinations and <u>de novo</u> the court's legal interpretation of the statutes and sentencing guidelines."  <u>United States v. Poyato</u>, 454 F.3d 1295, 1297 (11th Cir. 2006) (alterations and quotation marks omitted).

grow marijuana at a house rented by Franco and supervised the marijuana growing operation. See United States v. Saunders, 318 F.3d 1257, 1271 n.22 (11th Cir. 2003) ("[T]he findings of fact of the sentencing court may be based on evidence heard during trial . . . ." (quotation marks omitted)). This degree of supervision and control over the drug conspiracy is sufficient to support a finding that Franco was a manager. There is no dispute that the drug conspiracy involved at least one other participant–Lopez. Accordingly, the district court did not err in imposing the two-level managerial role enhancement or in denying Lopez safety-valve relief.[3]

    **AFFIRMED.**

---

[3]Franco's argument that the district court refused to permit him to call defense witnesses at the sentencing hearing is belied by the hearing transcript, which shows that Franco never asked the district court to permit either him or other witnesses to testify at that hearing.