[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 9, 2010
JOHN LEY
CLERK

No. 10-11303
Non-Argument Calendar

_____

D.C. Docket No. 1:08-cr-00069-ODE-JFK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ENRIQUE PEREZ OCHOA,
a.k.a. Lucio Perez Ochoa,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(November 9, 2010)

Before CARNES, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Enrique Perez Ochoa appeals his convictions following a conditional guilty plea to possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); possession of firearms during the commission of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and possession of firearms by an illegal alien, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2). He argues, first, that his warrantless arrest was not supported by probable cause and, thus, the contemporaneous search was not a valid search incident to arrest. Second, he claims that his wife did not validly consent to the first, warrantless search of their home. Third, he contends that the search warrant supporting the second search of the home was invalid because it omitted certain facts about the investigation and first search. Fourth, he argues that the agents exceeded the scope of the search warrant when they seized unlisted weapons, ammunition, drugs, paraphernalia, and money, particularly the items found behind the false wall in his children's bedroom closet. Finally, he claims that his post-arrest statements were obtained in violation of his right to counsel and as the product of an illegal arrest. For the reasons set forth below, we affirm.

I.

After pleading not guilty to the grand jury indictment, Ochoa moved to suppress (1) all evidence gathered pursuant to the warrantless search of his person

2

and residence, (2) any of his statements obtained in violation of the Constitution, (3) the seizure of his person, and (4) any statements or evidence obtained as a result of the warrant search of his residence, which was the fruit of the tainted warrantless search and seizure. He argued that (1) his arrest had not been supported by a warrant or probable cause; (2) officers searched his home without a warrant and over his objection; (3) his wife did not voluntarily consent to the search; (4) the subsequently obtained search warrant for Ochoa's home was invalid because it was based on evidence from the initial unlawful search; (5) the officers exceeded the scope of the search warrant when they seized items not identified in the search warrant; and (6) his post-arrest statement was obtained in violation of his right to counsel.

Viewed in the light most favorable to the government, *see United States v. Ramirez*, 476 F.3d 1231, 1235 (11th Cir. 2007), the following evidence was adduced at the suppression hearing. Officer Sung Kim, of the Atlanta Police Department's ("APD") Safe Street Gang Task Force, received information that Ochoa might have been wanted by Mexican authorities in connection with a double homicide. Ochoa was from an area of Guerrero, Mexico, known as a drug-smuggling corridor. Kim was told that Ochoa had several vehicles, including a blue Ford pickup truck, and was always armed with a handgun. He asked Special

3

Agent Steve Ledgerwood of Immigration and Customs Enforcement ("ICE") to verify this information.

With the assistance of an ICE agent located in Mexico, Ledgerwood verified that Ochoa was wanted in connection with a double homicide. Ledgerwood relied on multiple criminal, immigration, credit-check, and identity databases, as well as the other agent's vetted sources and a Mexican newspaper article about the homicide. During his investigation, he found an indication that someone named Lucio Perez Ochoa was living at the Atlanta address, but their information had established that the occupant was named Enrique Perez Ochoa. One criminal database included an entry for an individual named Lucio Perez Ochoa, who had been born in Mexico. Based on his independent investigation, including the discovery that Ochoa was using false social security numbers and was not entered into any immigration database, Ledgerwood informed Kim that he believed Ochoa to be in the country illegally. He proposed attempting to make contact with Ochoa, in order to initiate deportation proceedings and contact Mexican officials about Ochoa's suspected involvement in the double homicide.

Kim, Ledgerwood, and other APD and ICE officers went to Ochoa's apartment to make contact with him. After they positioned themselves in vehicles around the apartment, a blue Ford pickup truck and another vehicle drove past

them and parked next to the apartment. When Ochoa exited the truck, the officers drove up slowly, exited their vehicles, identified themselves as law enforcement officers, and instructed him in English and Spanish to raise his hands. Ochoa hesitated, then turned toward them and put his hands on the front of his waistband. Kim knocked him to the ground, and he and other officers struggled with him for 15 to 30 seconds in order to pull his hands from his waistband and cuff them behind his back. When Kim patted Ochoa down, he found a locked and loaded semiautomatic handgun in his waistband and two additional clips, with rounds inside, in his front pocket. In Ochoa's wallet, Kim found a valid Georgia driver's license and a document from the Mexican consulate, both of which bore the name Lucio Perez Ochoa and addresses located in a different apartment complex. Kim thought the driver's license was significant, as an illegal alien cannot obtain a driver's license in Georgia.

After Ochoa was handcuffed, Ledgerwood and two other officers immediately went to the apartment door. When Santana answered Ledgerwood's knock, he asked her in Spanish whether anyone else was in the apartment, then asked for her permission to look inside the apartment for other people. She agreed, and the three officers performed a cursory security sweep, including the two bedrooms and the closets. After the sweep, they returned to the living room

and Ledgerwood asked Santana, in Spanish and using a normal tone of voice, for permission to search the apartment for illegal documents, weapons, and drugs. She gave permission for the search. She appeared shocked but calm and compliant, she seemed to understand what he was asking, and he understood her response. None of the officers had their weapons drawn. The young child who was with Santana continued playing, smiling, and giggling. None of the officers made any threats or promises when they asked for her consent to the search. No officer took her outside at any time.

Ledgerwood told the other two officers that they could begin to search, but they did not. When he asked Santana whether the family had any documents or identification, she said they did and took him to the closet in the master bedroom, where she retrieved a folder of documents labeled "Riki's Family." "Riki" is a nickname for "Enrique." While she removed the documents from the closet, Ledgerwood opened a drawer in the dresser next to them and saw money bundled in plastic wrap and Ziploc bags. He left the money in the drawer, told the other two officers what he had found, and photographed it. When Ledgerwood questioned Santana about her identity, she said that she was in the country illegally. The folder of documents included near-identical birth certificates for Enrique Perez Ochoa and Lucio Perez Ochoa, a Mexican passport issued in

6

Atlanta in the name of Lucio Perez Ochoa, and a birth certificate for one of Santana's sons. She said that the man in the driveway was Lucio Perez Ochoa, who had been her husband for 12 years and with whom she had 4 children. Ledgerwood pointed out that the birth certificate identified Enrique as her son's father, at which point she became vague and eventually said that Enrique was Lucio's brother and her "other husband," with whom she had two children. At that time, about 15 minutes after the arrest, Kim approached and told them that Ochoa had said to stop searching the apartment. Ledgerwood and Kim terminated the search and Kim left to obtain a search warrant.

Ochoa had been placed under arrest for being present in the United States illegally. Before attempting to interview him, Ledgerwood advised him of his *Miranda*[1] rights by reading a Spanish-language form to him, verbatim, and placing the form where Ochoa would be able to read it. After each line, Ledgerwood asked Ochoa whether he understood. Neither officer made any threats or promises, and neither was armed. Ochoa appeared to understand his rights, did not have any questions about them, and seemed to be thinking clearly and logically. After Ledgerwood had read the form, Ochoa said that he was willing to speak to them and signed the waiver at the bottom of the form. Ledgerwood

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

started to ask his first question, but Ochoa said, "I think I want a lawyer." Ledgerwood turned to the other officer and said, "Okay, that's it," but Ochoa continued talking. Neither officer asked Ochoa any questions, but he continued to make several unprompted statements.

Based on information Kim had received throughout the day, including Ledgerwood's seizure of the two near-identical Mexican birth certificates, he obtained a search warrant for the apartment. During the warrant search, they found a semiautomatic handgun on a shelf in the family room and a thick folder containing identification documents, including birth certificates, a fake social security card for Santana, a fake immigration card, and a Mexican consulate identification card bearing Ochoa's full name and the address of the apartment being searched. They also found the large amount of cash, wrapped in plastic, in the dresser drawer in the master bedroom. In the back of the children's closet, they discovered a concealed compartment constructed from a piece of drywall. Believing that the compartment could contain additional illegal documents, they cut into the drywall. In the compartment, they found a large bag of cocaine, an electronic scale, approximately 157 loose rounds of ammunition wrapped in socks, numerous semiautomatic-handgun magazines, and numerous rifle magazines.

The district court denied the motion to suppress, finding that the arrest was

8

valid, the search of Ochoa's person was a lawful search incident to arrest, Ledgerwood and the other officer had not interrogated Ochoa in violation of his right to counsel, Santana had validly consented to the officers' entry into and warrantless search of the apartment, Kim's affidavit provided probable cause for issuance of the search warrant, and the seizure of the unlisted items had been appropriate under the plain-view doctrine.

Ochoa pled guilty to all counts and indicated his intent to appeal the denial of the motion to suppress. He was sentenced to a total of 106 months' imprisonment. On appeal, we held that he had not properly entered a conditional plea that the requirements of Federal Rule of Criminal Procedure 11 had not been satisfied because although the government had consented to a conditional plea and Ochoa mistakenly believed that the suppression issue had been preserved it had not been properly preserved in the record. *United States v. Ochoa*, No. 09-10932, manuscript op. at 2 (11th Cir. Nov. 24, 2009). Accordingly, we vacated and remanded his convictions so the district court could allow Ochoa to enter a conditional plea. *Id.* at 10. On remand, Ochoa pled guilty pursuant to a written, conditional plea agreement. He now appeals the denial of the motion to suppress.

II.

In reviewing the denial of a motion to suppress, we review the district

court's findings of fact for clear error and its application of law to those facts *de novo*. *Ramirez*, 476 F.3d at 1235. Law enforcement officers may briefly detain individuals for investigatory purposes if they have a reasonable, articulable suspicion, based on objective facts, that the individual has engaged in, or is about to engage in, criminal activity. *See United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007). Reasonable suspicion is a less demanding standard than probable cause, but requires a minimal level of objective justification. *Id.* Officers may draw on their experience and specialized training to make inferences and deductions from the available information, but the information on which they rely must be reliable in its assertion of illegality and should be corroborated by independent police work. *Id.* at 1290-91. An investigatory stop does not necessarily become an arrest merely because an officer displays his weapon, particularly as the officer may act reasonably in being prepared for possible violence. *See United States v. Roper*, 702 F.2d 984, 987-88 (11th Cir. 1983) (concerning vehicle stops).

An arrest must be supported by probable cause, which requires a reasonable belief, under the totality of the circumstances, that the suspect had committed or was committing a crime. *Lindsey*, 482 F.3d at 1291. Even if the officer's initial approach was unlawful, the resulting arrest can be rendered lawful based on the

10

suspect's subsequent conduct, such as attempting to resist arrest or to assault an officer. *United States v. Gonzalez*, 71 F.3d 819, 826-27 (11th Cir. 1996), *abrogated in part on other grounds*, *Arizona v. Gant*, 556 U.S. __, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), *as recognized by United States v. Davis*, 598 F.3d 1259, 1262 (11th Cir. 2010). The officer may conduct a lawful search incident to arrest by searching the area within the immediate control of the arrestee, into which he might be able to reach for a weapon or evidentiary items. *Chimel v. California*, 395 U.S. 752, 762-63, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

Here, Kim and Ledgerwood developed information from multiple, objective sources that indicated the following: (1) a man named Enrique Perez Ochoa was wanted by Mexican authorities in connection with a double homicide; (2) a man by that name was known to live in an apartment in Atlanta; (3) the name Lucio Perez Ochoa was also associated with the apartment and appeared in a criminal database; (4) Ochoa was known to carry a firearm at all times; and (5) he was not entered into any immigration database and was using false social security numbers. The district court did not clearly err in finding that these facts gave rise to a rational inference that Ochoa had entered the United States illegally and was the individual wanted in Mexico for homicide. Therefore, the court did not err in finding that the officers had reasonable suspicion to support the initial approach in

11

the parking lot. *See Lindsey*, 482 F.3d at 1290-91.

In light of their information that Ochoa was armed at all times, the officers acted reasonably in drawing their guns during the initial approach, and their decision to do so did not convert the approach into an arrest. *See Roper*, 702 F.2d at 987-88. When Ochoa failed to comply with their instruction to show his hands, reached for his waistband, and proceeded to struggle with the officers until they could handcuff him, his efforts to resist the officers gave rise to probable cause supporting an arrest. *See Gonzalez*, 71 F.3d at 826-27. The search of Ochoa's person for weapons and identification, then, were part of a lawful search incident to arrest. *See Chimel*, 395 U.S. at 762-63, 89 S.Ct. at 2040. Accordingly, Ochoa's arrest was lawful and the evidence obtained from his person was not subject to suppression.

### III.

A warrantless search is proper when preceded by valid consent. *United States v. Dunkley*, 911 F.2d 522, 525 (11th Cir. 1990). The consent must be voluntarily given by a person having, or reasonably appearing to have, authority to do so. *Id.* A search of a home based on consent given by one resident is unreasonable as to a co-resident who is physically present for the exchange and expressly refuses consent. *Georgia v. Randolph*, 547 U.S. 103, 121, 126 S.Ct.

12

1515, 1527, 164 L.Ed.2d 208 (2006).  However, the search is reasonable as to the co-resident if he is merely nearby but not invited to take part in the colloquy, thus "los[ing] out" on his opportunity to prevent the search.  *Id.*  This remains true even if the target of the search is absent because he is being detained in a squad car not far away.  *See id.* (discussing *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)).  Additionally, officers may seize evidence if, during questioning of the suspect's wife, the wife voluntarily retrieves and surrenders the evidence to them.  *Coolidge v. New Hampshire*, 403 U.S. 443, 488-90, 91 S.Ct. 2022, 2049-50, 29 L.Ed.2d 564 (1971).

In light of the facts set forth above, the district court did not clearly err in finding that Santana had authority to consent to the search and gave her consent freely and voluntarily.  *See Dunkley*, 911 F.2d at 525.  Accordingly, the fruits of the search, including the documents that Santana personally gave to Ledgerwood, were admissible against Ochoa.  *See Randolph*, 547 U.S. at 121, 126 S.Ct. at 1527; *Coolidge*, 403 U.S. at 488-90, 91 S.Ct. at 2049-50.

IV.

A warrant affidavit must show a fair probability that contraband or evidence of a crime will be found at the particular place to be searched.  *United States v. Jiminez*, 224 F.3d 1243, 1247 (11th Cir. 2000).  In deciding whether probable

cause to issue the warrant exists, the judge must "make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 1248. Insignificant and immaterial misrepresentations or omissions will not invalidate a warrant. *United States v. Reid*, 69 F.3d 1109, 1114 (11th Cir. 1995).

Here, Kim swore an affidavit that set forth a general description of the officers' encounter with Ochoa, Santana's representation that they were in the country illegally, Ledgerwood's description of the identity documents he had seen, and the fact that Ochoa was carrying a valid driver's license, which he could not have validly obtained in Georgia as an illegal alien. The district court did not clearly err in concluding that the issuing judge could have found a fair probability that the apartment would contain documents showing that (1) Ochoa had entered the country illegally and (2) he was the Enrique Perez Ochoa who was wanted in Mexico. *See Jiminez*, 224 F.3d at 1248. Kim's omission of the fact that Ledgerwood had already seized the two near-identical Mexican birth certificates was immaterial, as those documents were insufficient on their own to satisfy the purposes of the warrant and would have only strengthened, not weakened, the showing of potentially illegal activity. Similarly, the mere fact that Ledgerwood

14

had seen bundled money in a drawer did not convert the investigation into a drug investigation, so Ochoa has not shown that the officers affirmatively misled the issuing judge as to the true purpose of the warrant. Accordingly, the court did not err in finding that the search warrant was valid.

V.

The plain-view doctrine permits a warrantless seizure where the officer is lawfully located in the place from which the seized object could be plainly viewed and has a lawful right of access to the object itself. *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). The officer may seize any item that he has probable cause to believe is contraband, and any item whose incriminating nature is immediately apparent. *Id.* Seizure of items not covered by a warrant does not invalidate an otherwise valid search if the search and seizure were reasonable under all the circumstances. *United States v. Schandl*, 947 F.2d 462, 465 (11th Cir. 1991). Officers executing a warrant may search as extensively as reasonably necessary to located the items described in the warrant, and they may break into locked containers that might contain the items. *United States v. Jackson*, 120 F.3d 1226, 1228-29 (11th Cir. 1997).

Here, the valid search warrant gave the officers lawful access to the entire apartment. *See Smith*, 459 F.3d at 1276. The guns, drugs, and other items were in

plain view as the officers searched shelves, drawers, and other places where documents might have been located. *See id.* The incriminating nature of these items would have been immediately apparent. *See id.* With respect to the drywall compartment in particular, the district court did not clearly err in crediting Kim's testimony that it appeared to be a constructed hiding place and, thus, they thought additional fraudulent documents might be concealed inside. Having reached that conclusion, the officers were permitted to break into the compartment. *See Jackson*, 120 F.3d at 1228-29. Accordingly, the guns, drugs, and other evidence were properly seized pursuant to the plain-view doctrine.

## VI.

An accused person in custody who has expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). Here, the uncontroverted evidence showed that Ledgerwood and his fellow officer stopped questioning Ochoa immediately when he invoked his right to counsel, but Ochoa made several unprompted statements despite their silence. Thus, the officers did not violate Ochoa's right to counsel, and the

16

statements were admissible under *Edwards*.

For the foregoing reasons, we affirm Ochoa's convictions.

**AFFIRMED.**